# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **T STREET DEVELOPMENT, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No. 05-524 (GK)** |
| | : | |
| **DEREJE & DEREJE,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

The present case arises out of a dispute between the parties over the sale of real property located at 635-637 T Street, N.W., and 634-636 Florida Avenue, N.W., in Washington, D.C. ("the T Street Property"). Plaintiff seeks specific performance of the contract it alleges was entered into; Defendants seek dismissal of the case.

On September 9 and 10, 2008, a bench trial was held and each party presented two witnesses. Based on the testimony presented by those witnesses, the exhibits admitted into evidence, and the parties' representations of what facts were not in dispute, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.      Plaintiff, T Street Development, LLC ("T Street LLC"), is a limited liability company, which was established under the laws of the District of Columbia on February 15, 2005. It is, at this time, a validly registered limited liability company in the District of Columbia. Defendant, Dereje & Dereje ("D&D"), is a general partnership organized under the laws of the District of Columbia.

Its only general partners are Defendant Dereje Dergie,[1] who is a resident of North Carolina, and Dereje Yadeta, who is a resident of Maryland.  Both general partners have also been sued individually.

2.      The Defendants are owners of record of real property and improvements located at 635-637 T Street, N.W. and 634-636 Florida Avenue, N.W. in Washington, D.C. ("the T Street Property").

3.      On October 28, 2004, D&D entered into a written contract ("the October Contract") to sell the T Street property to T Street Corporation ("T Corp.") or its assigns.  The contract was signed by Thomas A. Hart, Jr. ("Hart") and executed on behalf of T Corp.  At no time relevant to this lawsuit has T Corp. been a District of Columbia corporation.  At no time did Hart ever attempt to establish an entity known as T Corp. in the District of Columbia.  Nor has the term "T Corp." ever been registered with the Department of Consumer Affairs of the District of Columbia as a fictitious trade name.[2]

4.      The purchase price specified in the October Contract was $925,000.  The October Contract called for closing to occur on or before the later of (a) December 22, 2004 or (b) within seven days of the expiration of the tenants' statutory rights to purchase the property.  The contract required a deposit of $50,000 which was tendered in due course by the purchaser.

---

[1]      Defendants' names are spelled different ways in many documents. The Court is using the spelling used in the Complaint.

[2]      In the District of Columbia, any entity wishing to use a trade name or a fictitious name in conducting its business must comply with D.C. Code 47-2855.02 (2001). Under that statute, any "person who carries on, conducts, or transacts business in the District of Columbia under any trade name shall register that trade name" with the Department of Consumer Affairs. It is undisputed that T Corp. has never been registered with that Department.

5.      Hart is an adult resident of the District of Columbia.  He is an experienced District of Columbia attorney, a real estate investor, and developer.  He has been a partner in several major law firms in the District of Columbia and has held himself out to the public as being an expert in real estate law, as well as other unrelated areas, such as telecommunications.

6.      On numerous occasions from late October 2004 through April 22, 2005, Hart utilized the unregistered fictitious trade name of T Corp. in proposed, as well as actual, contracts to acquire the T Street property, in correspondence relating to the T Street property with real estate brokers and the North American Title Company, and in attempting on April 22, 2005 to assign its contract rights to purchase the T Street property to T  Street LLC.

7.      All negotiations for purchase of the T Street property were carried out by Hart and Jon Wilson ("Wilson").  Wilson was a licensed real estate broker in the District of Columbia who worked with Demers Real Estate Company.  All communications about the purchase of the T Street property went through Wilson to his principal, D&D.  In fact, Hart never met the individual Defendants during any phase of the contract negotiations.  Wilson testified clearly and credibly that he had no independent authority to commit the individual Defendants to any contractual provision as the negotiations proceeded.  In each and every instance, he was required to, and did, convey Hart's proposal to the individual Defendants for their acceptance, rejection, or counterproposals.

8.      All of the parties found it impossible to meet the original closing deadline set forth in the October Contract.  Hart needed more time to obtain the necessary financing.  The individual Defendants needed more time to give the existing tenants the requisite notice and time to exercise

their rights to purchase the T Street property under District of Columbia law.[3]  For that reason, on

December 17, 2004, the parties executed a second contract for the sale of the T Street property ("the

December Contract").  Once again, Hart, acting solely on behalf of T Corp., signed a contract for the

purchase of the T Street property.  That contract was ratified by the individual Defendants on

December 22, 2004.  It contained a "time is of the essence" provision as to the settlement date.

Under the December Contract, closing was to occur before the later of January 28, 2005, or within

seven days of the expiration of the tenants' rights to purchase the T Street property.  Each of the

tenants was given notice of their right to purchase on or about December 7, 2004.  The deadline for

the tenants' exercise of their right to purchase the property had passed by the end of December, 2004.

     9.     A representative of North American Title Company told Wilson, before January 28,

2005, that there would be no closing on that date and that he should contact Hart.  The parties did

not attempt to reach any agreement, prior to January 28, 2005, regarding an extension of the

settlement date specified in the December Contract.

     10.     No settlement was held on January 28, 2005 because Hart, sometimes acting on

behalf of T Corp. and sometimes acting on behalf of the not yet created T Street LLC, was unable

to obtain the necessary financing.  By January 21, 2005, Hart knew he could not go to closing on

January 28, 2005, because of the financing problems.  Defendants were ready and willing to go to

settlement on January 28, 2005.

     11.     At no time after January 28, 2005, was any <u>written</u> modification agreement or <u>written</u>

extension agreement as to the January 28, 2005 closing date ever drafted by any person or entity

---

[3]     <u>See</u> Rental Housing Conversion and Sale Act of 1980, D.C. Code § 42-34.04.02, <u>et
seq.</u>, as amended.

acting on behalf of the purchaser of the T Street property or the individual Defendants-sellers of the T Street property.

12.    Once the January 28, 2005 deadline passed, neither the Defendants nor Wilson initiated any contact with the Plaintiff or Hart because, in Wilson's words, "the deal was dead" and in Defendant Dergie's words, "it had all gone on too long."

13.    After the January 28, 2005 date had passed, there were telephone conversations, on or about February 9, 2008, which Hart initiated, among Hart, Wilson, and Gary Israel (a real estate broker known to both Hart and Wilson who was helping to facilitate the sale) to try to reach closure on the sale of the T Street property.  Hart admitted that prior to February 9, 2005, he had no written documents evidencing a firm commitment by any of his prospective financial backers to make the loan necessary for him to go to settlement.

14.    In the early February conversations, Hart tried to negotiate a two-week extension of the December Contract's settlement date on the assumption that that Contract was still in existence even though its settlement deadline of January 28, 2005 had come and gone.  Wilson suggested to Hart that, if any extension of the settlement date was to be granted by the Defendants, there be payment of $200 per day for every day between January 28, 2005 and a rescheduled settlement date, and that the $50,000 deposit which Hart had tendered in October 2004 become an "earned deposit."[4]

15.    Wilson spoke to the two sellers and suggested that the closing date be extended, that there be a $200 per diem payment for every day between January 28, 2005 and any actual closing date, and that the $50,000 deposit which had been made in October 2004 become an "earned

---

[4]    Whether Wilson proposed the conversion of the October 2004 deposit into an "earned deposit" was a subject of dispute between the parties.  See e.g., Pl.'s Closing Argument at 9 n. 2. Nevertheless, neither party introduced any evidence to clearly define the term.

deposit." The sellers were "not crazy about" extension of the settlement deadline, but told Wilson that if Hart agreed to all of those points, they would be willing to go forward on those terms; they emphasized to Wilson that they wanted any such extension to include a firm and final deadline for settlement. Wilson then conveyed that proposal (the one he had suggested to the sellers and which they authorized him to make) to Hart.

16.     Hart did not like the proposal and countered with his own. He offered a per diem of $100 per day for each day between January 28, 2005 and any actual settlement date, and a $25,000 earned deposit. Wilson told Hart that he would have to speak to the sellers about the proposal and get back to him. The sellers rejected Hart's counterproposal and Wilson conveyed that rejection to Hart. At that point, Hart did not make any further counterproposal.

17.     On February 13, 2005, the sellers asked Wilson to prepare a release agreement. Subsequent to the 24 hour period on or about February 9, 2005 during which Hart and Wilson were exchanging proposals, Hart continued to work with the settlement agent, North American Title Company, to arrange closing and with his financial backers to finalize financing arrangements. On February 14, 2005, North American Title Company informed Wilson that the closing would be held on February 16, 2005 at 2:00 p.m. T Street LLC, through its attorney Allan Vollmann, sent the sellers a letter confirming that closing was scheduled for February 16, 2005.

18.     On February 14, 2005, Defendant Dergie executed a release agreement, releasing the $50,000 Hart had deposited under the October and December Contracts. On February 15, 2005, Defendant Yadeta also executed the release agreement. On February 15, 2005, the release agreement, which was fully executed by the individual Defendants, was couriered and actually

delivered to the offices of Holland & Knight to the attention of Hart.  At that time, Hart was a partner at Holland & Knight.

19.     On  February 16, 2005, the Defendants did not attend any closing at the offices of North American Title Company.  All instruments, including the property deed, settlement sheet, deed of trust, and deed of trust note prepared for the scheduled settlement were in the name of T Street LLC, not in the name of T Corp., or Hart.  T Street LLC had been formally created and established the previous day, February 15, 2005.  Neither the October Contract, the December Contract, nor any other papers relating to the real estate transaction regarding sale of the T Street property were in the name of T Street LLC.

20.     As of February 16, 2005, T Street LLC was not an assignee of any rights to either the October or December Contracts.  The Assignment to T Street LLC was not executed until April 22, 2005, after the filing of this Complaint, but before the filing of the Amended Complaint.

21.     The release agreement was never signed by any entity associated with the purchaser; in other words, it was not signed by Hart, it was not signed by T Corp., and it was not signed by T Street LLC.

22.     On December 27, 2004, Hart, on behalf of T Corp., entered into a contract for the purchase of property at 633 T Street, N.W., in Washington, D.C. ("633 Property").  On January 31, 2005, Hart, on behalf of T Street LLC (which had not yet been created), entered into a contract for the purchase of property at 631 T Street, N.W. ("631 Property").

23.     The contracts for purchase of the 633 Property and the 631 Property were entered into prior to the negotiations on February 9, 2005 to extend the December Contract's January 28, 2005 settlement date.

24.     Hart testified that his plan was to purchase and develop the entire block of 600 T Street in order to construct a mixed use development.  He had engaged a zoning attorney to help with the legal issues.  He spent a substantial amount of time developing the plans for the project which was to be called "Hartland Commons," and expended resources, time, energy and money putting together a fairly detailed proposal for financiers and others whose support he sought.  Hart believed there would be ongoing development and property appreciation in the T Street Corridor, which was in the midst of the thriving U Street and 14th Street areas.

25.     At no time did Hart, on behalf of himself, T Corp., or T Street LLC, ever communicate to the individual Defendants or to Wilson the existence of his elaborate plan to acquire the T Street property as an essential segment of his overall plan to develop that area of T Street.  Nor, prior to January 31, 2005, did Hart, on behalf of himself, T Corp., or T Street LLC inform the individual Defendants or Wilson that he had executed contracts to purchase 631 and 633 T Street, N.W.[5]

_____

[5]     To the extent that these findings resolve conflicting testimony, and they do in substantial part, the Court credits the testimony of Wilson and rejects the testimony of Hart.  Wilson was a credible witness who gave detailed answers to the questions posed to him.  He was not evasive in his testimony, nor was he hostile  under cross-examination.  Finally, he had nothing to gain financially from his testimony; indeed, he would only receive a financial gain in the form of a commission, if Plaintiff, not the Defendants, prevails and specific performance is ordered.

Hart, on the other hand, was not credible.  He has much to gain financially from prevailing in this litigation.  In addition, he was an evasive witness, who did not have documentary evidence to back up important portions of his testimony.  At times, his memory of key events was fuzzy.  He sought to downplay his expertise in real estate law, when, in fact, that was the very expertise he offered in his law firm biography on the internet and to his prospective financial backers.

Hart claimed great surprise that the Defendants failed to appear for settlement on February 16, 2005.  That testimony was particularly implausible in light of the fact that on February 14, 2005, Hart's lawyer at Holland & Knight, Allan Vollmann, had a letter hand delivered to Wilson stating
(continued...)

## CONCLUSIONS OF LAW

The parties have spent three years battling over this property.  The parties have filed a number of voluminous briefs on various legal issues they believe to be involved in this case.  The parties have used a great deal of the valuable time of one of the Court's Magistrate Judges attempting to reach a settlement.  Now that the facts have been clearly established in an on-the-record, adversarial, evidentiary hearing, it is clear that the disposition of this case boils down to a single, rather straightforward issue.

On October 28, 2004, the parties executed a valid written contract for the purchase of property on T Street, N.W.  They were not able to meet their closing date.  On December 17, 2004, the parties then entered into a second valid written contract for purchase of the property on T Street, N.W.  Once again, the parties were unable to meet the deadline specified in the contract for closing on the property.

---

[5](...continued)
that "[w]e are prepared to vigorously protect the Purchaser's interest in this transaction and the property should closing not occur due to Seller's failure to proceed."  Obviously, Hart and his counsel were already anticipating that the settlement would not go forward and making not-so-veiled threats about what would occur should it not proceed as planned.  It should also be noted that on February 15, 2005, the day before the settlement that North American Title Company had unilaterally set at Hart's direction, Hart received the Release Agreement which had been fully executed by the individual Defendants stating that the December contract was "null and void."  Thus, Hart's claim that he expected to proceed to settlement on February 16, 2008 is not credible given the actions of his own counsel and his receipt of the Release Agreement.

Finally, Hart testified that he did not think he needed a written agreement to extend the settlement date of January 28, 2005.  It is not credible that an attorney with experience and expertise in real estate would seriously believe that he did not need a written agreement to change the terms of a previously written valid contract that contained an expired settlement deadline of January 28, 2005 -- especially in light of the fact that the December contract stated that time was of the essence.

The issue now is whether those actions the parties engaged in subsequent to January 28, 2005, constituted a valid contractual commitment obliging Plaintiff to purchase the property and Defendants to sell the property.  Plaintiff's argument is premised on a finding that there was an oral agreement between the parties that settlement on the property would be extended, day-to-day, for a reasonable period of time, so long as T Street LLC merely paid $200 for each and every day the closing was delayed.  The problem with this argument is that there simply was no such oral agreement.

As the facts recounted, *supra*, demonstrate, sometime during the first nine days of February 2005, Hart initiated a telephone call to Wilson and tried to negotiate a two-week extension of the settlement date of January 28, 2005 contained in the December Contract.  The December Contract ceased to exist at 12:01 a.m. on January 29, 2005, after the expiration of its settlement deadline.  At that point, there was no extension of the contract, there was certainly no meeting of the minds between the parties on a number of material terms, and there was no contractual relationship existing between the parties.

During the day on which there were telephone calls among Hart, Wilson, and Israel, Wilson, after receiving authorization from his clients, offered to extend the settlement date for the sale if $200 was paid for every day between January 28, 2005 and the actual settlement date, and if a firm and final deadline for settlement was established.  In addition, Defendants required that the $50,000 deposit which Hart had made on the property would become an "earned deposit."  Hart did not accept Defendants' offer and made a counteroffer.  He proposed a per diem of $100 per day for each day between January 28, 2005 and any actual settlement date (without specifying a firm and final

closing date).  He also counteroffered that only $25,000 would be deemed an earned deposit.  The sellers flatly rejected his counterproposal.  Neither sellers nor buyer made any proposals thereafter.

Once the December contract had expired, there was no sales contract in existence for the T Street property.  "For there to be an enforceable contract, there must be mutual assent of each party to all the essential terms of the contract."  Malone v. Saxony Coop. Apartments, Inc.,763 A.2d 725, 729 (D.C. 2000).  Here, there was no "mutual assent" or "meeting of the minds" as to a number of material "terms":  the parties disagreed on the per diem amount to be paid for each day of delay until the closing was accomplished, the parties disagreed on the amount of money to be termed an earned deposit, and the parties disagreed on the setting of a firm and final deadline for reaching settlement.

"The law is well settled that a statement purporting to accept an offer which contains a new material term operates as a counteroffer and must be accepted by the original offeror in order to form a binding contract."  763 A.2d at 728.  Hart's counteroffer was never accepted by Defendants.  Thus, there was no binding contract whether oral or written.  Moreover, Hart's conduct demonstrated his expectation that the settlement which he or his agents directed North American Title Company to schedule for February 16, 2005, would not go forward.  On February 14, 2005, Hart's lawyer wrote to Wilson threatening "to vigorously protect the Purchaser's interest . . . should closing not occur due to Seller's failure to proceed."  Thus, it is clear that Hart and his lawyer were already planning for an inconclusive settlement meeting.

In conclusion, once the terms of the December contract expired, no enforceable contract for the sale of the T Street property existed.  The series of telephone conversations in early February 2005 did not create a new contract to modify or extend the closing date for the T Street property. The Defendants did not agree on three items, each of which was a material term of any agreement

that might be reached.  <u>Malone</u>, 763 A.2d at 729-30; <u>Georgetown Entm't. Corp. v. District of Columbia</u>, 496 A.2d 587, 590 (D.C. 1985).  Consequently, there was no contract.[6]

For these reasons, Plaintiff has not proven by a preponderance of the evidence that it is entitled to specific performance regarding the sale of the T Street property, judgment is entered for Defendants, and the case is dismissed.

October 7, 2008                                      /s/_____
                                                     Gladys Kessler
                                                     United States District Judge

**Copies via ECF to all counsel of record**

---

[6]       In <u>Malone</u>, the District of Columbia Court of Appeals, on facts somewhat similar to this case, ruled that "no contract can be said to have been formed" because the purchaser failed to indicate his "unequivocal assent" to the seller's counteroffer and therefore there was no meeting of the minds between the two parties necessary to form an enforceable contract.  <u>Malone</u>, 763 A.2d at 730.